UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | S1 23 Cr. ⌐ ) C |
| JOSEPH LEWIS, PATRICK O'CONNOR, and BRYAN "MARTY" WAUGH, | |
| Defendants. | |

---

The Grand Jury charges:

## Overview

1.      Between at least in or about 2013 and 2021, JOSEPH LEWIS, the defendant, a billionaire businessman and investor, engaged in multiple schemes to violate the securities laws through insider trading and submitting false and misleading filings with the United States Securities and Exchange Commission ("SEC"). On numerous occasions from at least in or about 2019 through in or about 2021, LEWIS misappropriated inside information from publicly traded companies in which he was a large investor and used that information to tip or direct the trading of his friends and associates, including his personal pilots, PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, as well as his personal assistants, romantic partners, and other acquaintances, so that they could profit on that material non-public information by trading securities in advance of its disclosure to the public. Additionally, from at least in or about 2013 through at least in or about August 2018, LEWIS conspired with others to hide his ownership of shares of a pharmaceutical company through a pattern of false filings and misleading statements.

2.      In furtherance of his insider trading, JOSEPH LEWIS, the defendant, obtained inside information about companies in which he was invested, including material non-public

information about companies' financial outlook, planned announcements, and in the case of biotechnology companies, results of clinical trials. LEWIS was under a duty to keep that information confidential, and to refrain both from trading based upon it and causing others to do so. But after learning about the material non-public information, LEWIS tipped PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, and encouraged them to trade. Indeed, in one instance, after learning non-public information about a company's upcoming announcement of favorable clinical results, LEWIS gave O'CONNOR and WAUGH short term loans, each worth $500,000, so that they could buy the company's stock before the clinical trial news became public. On several other occasions, after learning non-public information about companies, LEWIS advised his personal assistants and romantic partners to buy the stock of those companies, impressing upon them the importance of purchasing the stock as soon as possible. LEWIS also recommended to certain of his friends that they purchase stock in advance of public announcements that LEWIS knew were forthcoming. Notwithstanding his vast personal wealth, LEWIS provided the inside information to his employees, romantic partners, and friends as a way to give them compensation and gifts.

3.     Using the information stolen by JOSEPH LEWIS, the defendant, his employees, romantic partners, and friends were collectively able to make millions of dollars by insider trading in the stocks of Solid Biosciences, Mirati Therapeutics, Australian Agricultural Company, and BCTG Acquisition Corporation.

4.     In addition, from at least in or about 2013 through at least in or about August 2018, JOSEPH LEWIS, the defendant, conspired with others to defraud Mirati Therapeutics, the investing public, and the SEC by amassing beneficial ownership of more than twenty percent of Mirati Therapeutics' stock in contravention of agreements with the company, by hiding his

2

undisclosed ownership of Mirati Therapeutics shares through shell corporations in the names of nominees, by deliberately omitting those entities from SEC filings and falsely reporting his share ownership of Mirati Therapeutics, and by causing false statements to be made to HSBC Bank when it attempted to conduct diligence on LEWIS's transactions related to this scheme.

## Background

5.     JOSEPH LEWIS, the defendant, is a British businessman and investor. LEWIS is the principal owner of the Tavistock Group ("Tavistock"), which is an international private investment organization. Tavistock's investment portfolio includes hundreds of companies, including in agriculture, sports, resort properties, and life sciences. During the period relevant to this Indictment, LEWIS made investments in publicly traded life science companies through a private biotechnology investment fund (the "Hedge Fund"), of which LEWIS was the principal beneficial owner. As the majority owner of the Hedge Fund, LEWIS received updates on the investments that were made by the Hedge Fund, including information about investment opportunities and the results of clinical trials by certain companies in which LEWIS had invested. By virtue of the size of LEWIS's investments in certain companies, he controlled one or more board of director seats, and he deputized employees of the Hedge Fund to serve on those companies' boards on behalf of LEWIS and his companies. As chairman of Tavistock, and the majority owner of the Hedge Fund, LEWIS also owed duties of trust and confidence to the principals and minority owners of the Hedge Fund.

6.     Through its membership on certain companies' boards, the Hedge Fund learned material, non-public information about the companies, and that information was shared at relevant times with JOSEPH LEWIS, the defendant. At all times relevant to this Indictment, LEWIS understood that the Hedge Fund received material non-public information, that the information

3

shared with LEWIS was confidential, and that LEWIS and the Hedge Fund were restricted from sharing that information with third parties, or trading on the basis of the confidential information.

7.     PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, were at all times relevant to the Indictment pilots employed by JOSEPH LEWIS, the defendant, to fly his private aircraft. Their duties included transporting LEWIS between countries. LEWIS owns a 98 meter super yacht, known as the Aviva, that travels around the world and, at times, serves as LEWIS's primary residence. From time to time, O'CONNOR and WAUGH flew to the location of the Aviva to transport LEWIS to or from the yacht.

### Insider Trading in Australian Agricultural Company Securities

8.     Australian Agricultural Company ("AAC") is a publicly listed Australian company that at all times relevant to this Indictment owned and operated cattle feedlots and farms in Australia. Shares of AAC are traded on the Australian Securities Exchange, and are available for purchase and sale in the United States through the over-the-counter market. At all times relevant to this Indictment, JOSEPH LEWIS, the defendant, beneficially owned a majority of AAC's stock, and two employees of Tavistock, who reported to LEWIS, served on AAC's board of directors.

9.     Between on or about January 25, 2019, and on or about February 14, 2019, a monsoon caused significant flooding in Queensland, Australia. The flooding impacted AAC, but because the company's properties span millions of acres, the effect of the flooding, as well as its impact on the company financially, was initially unknown. At or around the beginning of February 2019, members of AAC's board of directors began providing updates to JOSEPH LEWIS, the defendant, about the flooding in Australia and its potential impact on the business. While the Australian press was reporting publicly that there were cattle losses in the Queensland area, members of AAC's board of directors privately provided confidential information to LEWIS about

4

the financial losses that AAC was expected to suffer from the flooding before that information was otherwise made public.

10.     On or about February 10, 2019, AAC's board of directors held a meeting to discuss the effects of the flooding on the company, and determined that the losses caused by the flooding were likely to be material. During the meeting, the board also determined that it should issue a press release to disclose the material impact to the market. At the time, the fact that the flooding was likely to cause a material financial loss to AAC was not publicly known, and reporting about the possible impact of the flooding had not been confirmed by the company. That same day, a board member employed by Tavistock informed JOSEPH LEWIS, the defendant, that the losses to the company were material, that AAC did not have insurance coverage relating to the cattle it lost in the flooding, and that the Australian government was not expected to cover any portion of the losses.

11.     On or about February 10, 2019, after the AAC board meeting, but before the company had released any information publicly, JOSEPH LEWIS, the defendant, called PATRICK O'CONNOR, the defendant, and they discussed that O'CONNOR and BRYAN "MARTY" WAUGH, the defendant, should sell all of the stock of AAC that they had purchased previously. During the call, LEWIS shared with O'CONNOR material non-public information about AAC, and told O'CONNOR that he and WAUGH should trade as soon as possible. After the call, O'CONNOR told WAUGH the information, and they both contacted their stockbroker to order the sale of all of their stock of AAC.

12.     On or about February 11, 2019, before the market opened in Australia, AAC issued an announcement titled "Impact of Queensland Floods," which stated that the board of AAC confirmed that severe flooding impacted some of AAC's properties and was expected to cause

5

material financial losses. Following the announcement, AAC's share price closed down 12.3 percent from the prior day. Notwithstanding the tip from JOSEPH LEWIS, the defendant, to PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, the pilots' stockbroker was unable to execute their sell orders before AAC's public announcement because the shares were traded over the counter. After the stockbroker apologized to O'CONNOR about the delayed sales execution, O'CONNOR responded by email, "Just wish the Boss would have given us a little earlier heads up."

### Insider Trading in Solid Biosciences

13.     Solid Biosciences ("SLDB") is a publicly traded biotechnology company focused on developing treatments for Duchenne muscular dystrophy, a genetic disease. SLDB is listed in the United States on the Nasdaq stock exchange. In or around 2018, JOSEPH LEWIS, the defendant, became a significant shareholder of SLDB through the Hedge Fund and his own stock holdings.

14.     In or around July 2019, SLDB sought approximately $60 million in capital through a private investment in public equity ("PIPE") transaction. At the time, the shares JOSEPH LEWIS, the defendant, owned directly and through the Hedge Fund made him one of SLDB's three largest shareholders. On or about July 18, 2019, an investment bank working on behalf of SLDB contacted the Hedge Fund about potentially investing in the PIPE transaction. The Hedge Fund signed a confidentiality agreement, which required that the Hedge Fund, its directors, officers, employees, and other affiliates keep the information about the PIPE transaction confidential, and which prohibited trading in SLDB's stock on the basis of that non-public information. In connection with the PIPE transaction and the signing of the confidentiality agreement, SLDB provided the Hedge Fund with non-public information about a clinical trial

6

undertaken by SLDB, including non-public information about the clinical trial that SLDB intended to disclose to the market approximately a month later.

15.     After learning about SLDB's planned PIPE transaction and information about its clinical trial, an employee of the Hedge Fund informed JOSEPH LEWIS, the defendant, about the planned PIPE transaction and the Hedge Fund's participation in it. On multiple occasions before the news of the PIPE was public, including on or about July 24 and 25, 2019, LEWIS received updates about the Hedge Fund's negotiations to participate in the PIPE transaction. At the time the information about the PIPE transaction and the clinical trial was disclosed to LEWIS, he understood it was confidential, non-public information that was likely to have a material, positive effect on SLDB's stock price upon being announced.

16.     On or about July 25, 2019, at or around the time JOSEPH LEWIS, the defendant, received confidential information about SLDB's planned PIPE transaction, he was staying at the Four Seasons Hotel in Seoul, South Korea with a girlfriend (the "Girlfriend"). While together, and before either the news of the PIPE transaction or the news of SLDB's clinical trial was public, LEWIS tipped the Girlfriend and told her to purchase SLDB stock. Shortly after speaking to LEWIS, the Girlfriend logged into her brokerage account, checked her balance, and then used nearly all of her available funds to purchase 150,000 shares of SLDB for approximately $700,000.

17.     The next day, on or about July 26, 2019, JOSEPH LEWIS, the defendant, and the Girlfriend flew from Seoul to Massachusetts aboard LEWIS's private airplane, which was piloted by PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants. During the flight, LEWIS told O'CONNOR and WAUGH that he had purchased a large share of SLDB and that they should buy the stock as soon as possible.

18.     On or about July 26, 2019, before the Nasdaq market opened in the United States,

SLDB announced a $60 million private placement whereby the company would sell shares and pre-funded warrants to several large investors, including the Hedge Fund. The announcement occurred while PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, were flying JOSEPH LEWIS, the defendant, back to the United States, and as a result, they were unable to purchase SLDB stock prior to the company issuing its press release announcing the PIPE transaction. Nonetheless, SLDB still had not released its clinical trial results, and shortly after landing in the United States on or about July 26, 2019, O'CONNOR and WAUGH purchased SLDB stock.

19.     Following SLDB's announcement regarding the PIPE transaction on or about July 26, 2019, the company's share price increased by approximately 34.4 percent. On or about August 14, 2019, SLDB released confidential information about its clinical trial, some of which had previously been disclosed to the Hedge Fund in connection with the PIPE transaction. The company's share price then increased approximately 23 percent, and after analysts upgraded SLDB's share price based on the company's announcement, the share price rose an additional 43 percent. The Girlfriend subsequently sold her SLDB shares for a profit of approximately $849,000, for a 118 percent gain. In addition, in or about September and October 2019, PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, sold their SLDB stock for a profit.

Insider Trading in Mirati Therapeutics

20.     Mirati Therapeutics ("Mirati") is a publicly traded oncology company focused on the development of cancer therapeutics. Mirati is listed on the Nasdaq stock exchange. JOSEPH LEWIS, the defendant, is one of Mirati's largest shareholders by virtue of his direct and beneficial ownership, through the Hedge Fund, of Mirati stock. Because LEWIS is a significant Mirati

8

shareholder, he has control over a Mirati board seat, which at his direction is occupied by an employee of the Hedge Fund. As a member of Mirati's board, the Hedge Fund's employee routinely receives material non-public information about the company. The Hedge Fund employee shared material non-public information about Mirati with LEWIS, including at various times information about clinical trials, the timing of corporate announcements, and planned presentations of data at conferences. LEWIS understood the information shared with him was confidential, had been learned in connection with the Hedge Fund employee's presence on Mirati's board of directors, and was not public information. Because of the Hedge Fund's involvement with Mirati's board, and because confidential information was shared directly with LEWIS, the Hedge Fund, Tavistock, and LEWIS were highly restricted in when they could buy or sell Mirati stock. Indeed, the Hedge Fund has an agreement with LEWIS and employees working at his direction that they would pre-clear any trades in Mirati to confirm that the Hedge Fund, and by extension LEWIS, were not in possession of material non-public information at the time.

21.     In or about 2019, Mirati was conducting a clinical trial for a drug that would inhibit mutations of the KRAS gene, which underlies approximately 20 percent of human cancers. Because of the broad potential benefits of the drug, Mirati's stock price was generally responsive to news about the clinical trial. In or about August 2019, the Hedge Fund learned through a confidential update from Mirati that the company planned to release the first clinical data from its KRAS-inhibitor trial in the fourth quarter of 2019. The Hedge Fund provided that information to JOSEPH LEWIS, the defendant. In or around August 2019, after receiving additional confidential information about Mirati's clinical trial, the Hedge Fund updated LEWIS that Mirati's share price

9

was likely to remain in the range of $80 to $120 per share until Mirati put out its clinical data showing its drug was competitive with other companies.

22.     On September 10, 2019, an employee of the Hedge Fund visited JOSEPH LEWIS, the defendant, on his yacht, which was then docked in California. While staying on LEWIS's yacht, the employee of the Hedge Fund received confidential updates from Mirati's chief executive officer about positive results from Mirati's clinical trial. The Hedge Fund employee then told LEWIS about the positive developments in Mirati's clinical trial, and discussed how the company's share price, which was then trading around approximately $80 per share, could reach a price in excess of $100 per share. The Hedge Fund employee stayed aboard LEWIS's yacht until at least September 17, 2019.

23.     On or about September 17, 2019, JOSEPH LEWIS, the defendant, called the Girlfriend, provided her with material non-public information about Mirati, and told her to sell her SLDB shares and to purchase Mirati stock. LEWIS gave the Girlfriend instructions about how to sell SLDB and buy Mirati stock. The next morning, before the stock market opened, the Girlfriend called her stock broker and repeated LEWIS's instructions regarding selling her SLDB stock and buying Mirati stock. The Girlfriend also told her broker that "time is of the essence." After placing trades with her broker, the Girlfriend emailed LEWIS, "All good & all confirmed." On or about September 20, 2019, after her broker had finished selling SLDB stock and was almost finished in filling her purchase orders of Mirati stock, the Girlfriend told LEWIS's personal assistant that if LEWIS asked, "almost all order [were] through." In total, the Girlfriend purchased approximately 16,400 shares of Mirati, spending almost all of the funds in her brokerage account on the stock.

24.     In or around October 2019, the Hedge Fund provided additional updates to JOSEPH LEWIS, the defendant, about the timing of Mirati's announcement of its clinical trial results. On

10

or about October 10, 2019, PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, flew LEWIS from San Diego to The Bahamas. At or around the time of the flight, LEWIS told O'CONNOR and WAUGH to purchase as much Mirati stock as they could, and that they should sell their SLDB stock and purchase Mirati. As O'CONNOR stated in a conversation over WhatsApp with a friend he later tipped about the stock, he had "talked with Mr. Lewis," "we will make much more within the next 6 weeks with Mirati," and "think we have people who know." In the early morning hours of October 11, 2019, O'CONNOR emailed his broker that he wanted to sell all his shares of SLDB and use the proceeds to buy Mirati stock, emphasizing that it was a "top priority" and something he wanted completed by the next day if possible. Both O'CONNOR and WAUGH made purchases of Mirati stock on October 11, 2019—the day after they flew LEWIS.

25.     On or about October 14, 2019, PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, flew JOSEPH LEWIS, the defendant, from The Bahamas to Orlando, Florida. After the flight, O'CONNOR texted his friend to buy Mirati and that the "Boss is helping us out and told us to get ASAP." O'CONNOR added that "All conversations on app is encrypted so all good. No one can ever see." A day later, O'CONNOR added in the same text thread, that LEWIS said to buy Mirati stock, that Mirati "should only be short term," and that the "Boss mentioned around 6 to 8 weeks for [Mirati] to take profit." On the same day, October 15, 2019, LEWIS wired $500,000 each to O'CONNOR and WAUGH, which the defendants had agreed on a prior flight would be a loan from LEWIS to the pilots so that they could purchase additional Mirati stock. Both O'CONNOR and WAUGH subsequently used the $500,000 to purchase Mirati stock. On or about October 22, 2019, O'CONNOR texted his friend that the "Boss lent Marty and I $500,000 each for this," and that October 28, 2019, was the "big day for MRTX." He added that

he thought "the Boss has inside info" and "knows the outcome" because "otherwise why would he make us invest."

26.    In or about October 2019, JOSEPH LEWIS, the defendant, also recommended that his executive assistant purchase Mirati stock in advance of the announcement of the company's clinical trial results. LEWIS told his assistant to buy Mirati. LEWIS also told at least three other friends—including one with whom he was romantically involved and another with whom he sometimes played poker in Argentina—to buy Mirati stock in advance of the October announcement. Based on LEWIS's recommendation, his assistant and friends all purchased Mirati stock prior to the company announcing the clinical trial results.

27.    On or about October 28, 2019, Mirati announced favorable results for its KRAS-inhibitor clinical trial. The trial results were received well by the stock market, and on or about October 29, 2019, Mirati's share price closed up approximately 16.7 percent from the previous day's close. Following Mirati's announcement, PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, the girlfriend of JOSEPH LEWIS, the defendant, and LEWIS's assistant and friends all sold their shares of Mirati for a profit.

28.    On or about November 11, 2019, JOSEPH LEWIS, the defendant, asked PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, to repay the $500,000 loans he made to each pilot for purposes of purchasing Mirati stock. O'CONNOR and WAUGH both promptly repaid the loans' principal amounts, but without repaying any interest. WAUGH's record of the wire for the loan's repayment indicated it was a "loan payback for MRTX."

### Insider Trading in BCTG Acquisition Corporation

29.    In or around July 2020, the Hedge Fund created a special purpose acquisition company ("SPAC") called BCTG Acquisition Corporation. In or around January 2021, BCTG

12

began negotiating a potential business combination with Tango Therapeutics ("Tango"), a privately owned life sciences company. On or about January 27, 2021, BCTG sent Tango a non-binding letter of intent, and the parties began due diligence on a potential deal. Members of BCTG's board of directors, including board members working directly or indirectly for Tavistock, updated JOSEPH LEWIS, the defendant, about the status of BCTG's possible business combination and the due diligence process. That information, including the fact that BCTG and Tango were considering a business combination, was confidential and subject to a non-disclosure agreement between the parties.

30.     On or about February 4, 2021, JOSEPH LEWIS, the defendant, saw PATRICK O'CONNOR and BRYAN "MARTY" WAUGH, the defendants, and told them that they should purchase BCTG stock. Both pilots purchased the stock the same day. On or about February 8, 2021, as the deal between BCTG and Tango was progressing, O'CONNOR told his broker to "buy all the BCTG we can." O'CONNOR purchased additional shares of BCTG on or about February 8 and 10, 2021, and WAUGH purchased additional shares of BCTG on or about March 1, 2021.

31.     On or about March 10, 2021, BCTG provided an initial draft of a merger agreement to Tango, and over approximately the next month, negotiated the agreement's terms. Over the course of that period, members of BCTG's board told JOSEPH LEWIS, the defendant, about the status of the transaction, its proposed terms, and that the deal was expected to close on April 13, 2021.

32.     In or around March 2021, JOSEPH LEWIS, the defendant, told two of his personal assistants who were working on his yacht to purchase BCTG's stock. LEWIS told these assistants to purchase as much BCTG stock as they could, and that the stock could double, triple or even quadruple. LEWIS's assistants then purchased BCTG stock in March and April 2021.

33.     On or about April 14, 2021, BCTG publicly announced its planned merger with Tango. From market close on or about April 13, 2021, to market close on or about April 15, 2021, BCTG's price increased by 14.5 percent.

### The Scheme to Falsely Report LEWIS's Ownership of Mirati Therapeutics

34.     Mirati, which began as a Canadian company, is limited by Canadian law from having any shareholder who owns more than 19.99 percent of the company's stock. JOSEPH LEWIS, the defendant, was aware of this limitation, and as a result, LEWIS and his companies— including the Hedge Fund—were issued warrants (the option to purchase a company's stock) by Mirati that only could be exercised if LEWIS's total ownership of Mirati remained under 19.99 percent of the company's stock.

35.     As one of Mirati's largest shareholders, owning more than ten percent of Mirati's stock, JOSEPH LEWIS, the defendant, was required to file schedules of share ownership with the SEC pursuant to Section 13(d) of the Securities Exchange Act and SEC Regulation 13D, as well as reports of transactions purchasing or selling the company's stock. During the period relevant to this Indictment, LEWIS reported to the SEC that he beneficially owned between 16 and 19.99 percent of Mirati's stock, when in truth and as he well knew he beneficially owned more than 19.99 percent of the stock.

36.     In or about 2013, in order to own more Mirati stock, while simultaneously circumventing Canadian share ownership rules and the legal requirements that he report his share ownership to the SEC, JOSEPH LEWIS, the defendant, caused Mirati shares to be purchased in the names of offshore shell entities that he ultimately controlled. Specifically, in or about 2013, LEWIS asked one of his employees to serve as the reported owner of an offshore entity—later named Jasara Investments—that would hold shares of Mirati that LEWIS had previously

14

purchased for an ex-girlfriend, as well as purchase more Mirati shares with funds LEWIS provided. As part of LEWIS's agreement with his employee, in exchange for acting as the owner of the offshore entity, the employee would receive a share of the profits when the Mirati shares were sold. Although LEWIS was not the nominal owner of Jasara Investments, he had effective control of the entity, and beneficially owned the additional shares of Mirati stock that it purchased.

37.     Additionally, in or about 2013, JOSEPH LEWIS, the defendant, caused the creation of an offshore trust called Newton Trust, purportedly for the benefit of his granddaughter, for purposes of purchasing Mirati shares. Although LEWIS was not the named beneficiary of the trust, he considered himself as the beneficial owner of the shares. As part of the creation of Newton Trust, LEWIS adopted a "letter of wishes," which required that the trust use its funds to purchase Mirati stock, and stipulated that LEWIS would be consulted about decisions about the Mirati stock.

38.     Shortly after the creation of Jasara Investments and the Newton Trust, and continuing through 2016, JOSEPH LEWIS, the defendant, transferred funds to bank accounts held at HSBC in Switzerland in those entities' names for the purpose of purchasing Mirati stock. Additionally, LEWIS caused the shares of Mirati previously in his ex-girlfriend's account to be transferred to Jasara Investments. In a further act of concealment, LEWIS and his co-conspirators deliberately avoided owning more than 4.95 percent of Mirati's stock in either Jasara Investments or Newton Trust in order to avoid the SEC reporting requirements that apply to individuals and entities that own 5 percent or more of a company's stock.

39.     As a result of the scheme, JOSEPH LEWIS, the defendant, falsely reported to the SEC in Schedule 13D reports that he owned under 19.9 percent of Mirati's stock. Specifically, on approximately thirteen occasions between November 2013 and November 2017, LEWIS falsely swore on SEC filings to incorrect Mirati share ownership totals. At the time he swore to the

15

accuracy of those reports, LEWIS knew that they were not accurate. On multiple instances, a Tavistock finance executive working for LEWIS provided LEWIS with a spreadsheet disclosing LEWIS's true ownership of Mirati shares by including the share totals associated with Jasara Investments and Newton Trust. Nonetheless, while the secret spreadsheet provided to LEWIS stated that he owned between 24 and 29 percent of Mirati stock, LEWIS publicly stated in his SEC filings that he owned less than 20 percent.

40.    As a result of falsely disclosing his beneficial ownership of Mirati shares, JOSEPH LEWIS, the defendant, was able to exercise Mirati warrants through the Hedge Fund that he would not otherwise have been entitled to exercise. Specifically, on or about October 3, 2017, LEWIS in fact owned approximately 24.1 percent of Mirati stock, although he had reported owning an amount under 20 percent by deliberately omitting ownership of shares by Jasara Investments and Newton Trust. Because LEWIS falsely reported his ownership of Mirati shares as under 19.9 percent, he was able to exercise the warrants, and as a result, Mirati sold to him approximately $2,500,000 worth of stock for approximately $1,490,000 – a savings to LEWIS of approximately $1 million.

41.    In or about 2018, JOSEPH LEWIS, the defendant, caused the Mirati shares held by Jasara Investments and Newton Trust to be sold. After LEWIS's employee completed the sale of millions of dollars' worth of Mirati stock, he transferred approximately $25 million from Jasara Investment's HSBC account to another account LEWIS controlled. The remainder of the stock sale proceeds—approximately 7 percent of the money—was kept by the employee as his kickback for holding LEWIS's Mirati shares. Because of the size of the transfer from Jasara Investments, HSBC's compliance department inquired as to the reason for the transfer. LEWIS's employee falsely told HSBC that he was "repaying a loan made from [Lewis] to me." Prior to giving that

false answer to the bank, the employee ran the explanation by LEWIS, who was "happy with [the] explanation." In fact, however, as LEWIS knew, the explanation was false, and the employee was not repaying a loan. When HSBC asked questions about transfers by Newton Trust, LEWIS instructed his employees not to reply to HSBC.

42.     JOSEPH LEWIS, the defendant, kept secret the sale of Mirati stock through Jasara Investments and Newton Trust. Despite the fact that he signed and caused to be filed four SEC Form 3s and eight SEC Form 4s disclosing the purchase and sale of Mirati stock between June 12, 2013, and June 11, 2018, LEWIS never disclosed the purchase or sale of Mirati stock through Jasara Investments and Newton Trust. As a result of LEWIS's false statements and omissions in filings with the SEC, the agency and investors who review filings with the SEC were deprived of material information about LEWIS's ownership of Mirati and, as noted, Mirati was deceived into allowing LEWIS to exercise warrants that he was otherwise prohibited from exercising.

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

43.     The allegations contained in paragraphs 1 through 42 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

44.     From at least in or about February 2019 up to and including at least in or about September 2021, in the Southern District of New York and elsewhere, JOSEPH LEWIS, PATRICK O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (ii) securities fraud, in violation of Title 18, United States

17

Code, Section 1348.

45.     It was a part and object of the conspiracy that JOSEPH LEWIS, PATRICK

O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants, and others known and unknown,

willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate

commerce and of the mails, and a facility of a national securities exchange, would and did use and

employ, in connection with the purchase and sale of a security, a manipulative and deceptive

device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5,

by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a

material fact and omitting to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (c) engaging in an

act, practice, and courses of business which operated and would operate as a fraud and deceit upon

a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

46.     It was further a part and object of the conspiracy that JOSEPH LEWIS, PATRICK

O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants, and others known and unknown,

would and did knowingly execute, and attempt to execute, a scheme and artifice to (a) defraud a

person in connection with a security of an issuer with a class of securities registered under Section

12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d)

of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses,

representations, and promises, money and property in connection with the purchase and sale of a

security of an issuer with a class of securities registered under Section 12 of the Securities

Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities

Exchange Act of 1934, in violation of Title 18, United States Code, Section 1348.

18

## Overt Acts

47.     In furtherance of the conspiracy and to effect its illegal objects, JOSEPH LEWIS, PATRICK O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants, committed and caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.      On or about February 11, 2019, O'CONNOR and WAUGH each sold shares of Australian Agricultural Company stock.

b.      On or about July 26, 2019, and July 29, 2019, WAUGH and O'CONNOR, respectively, bought shares of Solid Biosciences stock.

c.      Between on or about October 11, 2019, and October 25, 2019, O'CONNOR and WAUGH each purchased shares of Mirati Therapeutics stocks.

d.      Between on or about February 4, 2021, and March 1, 2021, O'CONNOR and WAUGH each purchased shares of BCTG Acquisition Corporation.

(Title 18, United States Code, Section 371.)

## COUNT TWO
## (Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

48.     The allegations contained in paragraphs 1 through 42 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

49.     From at least in or about July 2019 up to and including at least in or about December 2019, in the Southern District of New York and elsewhere, JOSEPH LEWIS, the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, (i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title

19

17, Code of Federal Regulations, Section 240.10b-5; and (ii) securities fraud, in violation of Title 18, United States Code, Section 1348.

50.     It was a part and object of the conspiracy that JOSEPH LEWIS, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and courses of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Section 78j(b) and 78ff.

51.     It was further a part and object of the conspiracy that JOSEPH LEWIS, the defendant, and others known and unknown, would and did knowingly execute, and attempt to execute, a scheme and artifice to (a) defraud a person in connection with a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, in violation of Title 18, United States Code, Section 1348.

20

Overt Acts

52.     In furtherance of the conspiracy and to effect its illegal objects, JOSEPH LEWIS,

the defendant, committed and caused to be committed the following overt acts, among others, in

the Southern District of New York and elsewhere:

a.      On or about July 25, 2019, LEWIS caused the Girlfriend to purchase shares

of Solid Biosciences stock.

b.      Between in or about September 19, 2019, and September 30, 2019, LEWIS

caused the Girlfriend to purchase shares of Mirati Therapeutics stocks.

(Title 18, United States Code, Section 371.)

**COUNTS THREE THROUGH FIFTEEN**
**(Securities Fraud)**

The Grand Jury further charges:

53.     The allegations contained in paragraphs 1 through 42 of this Indictment are hereby

repeated, realleged, and incorporated by reference, as if fully set forth herein.

54.     On the dates set forth below, in the Southern District of New York and elsewhere,

JOSEPH LEWIS, PATRICK O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants,

willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of

interstate commerce and of the mails, and a facility of a national securities exchange, used and

employed, in connection with the purchase and sale of a security, a manipulative and deceptive

device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5,

by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a

material fact and omitting to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (c) engaging in an

act, practice, and course of business which operated and would operate as a fraud and deceit upon

a person, to wit, while in possession of material non-public information to which they had been

entrusted, and in violation of their duties of trust and confidence, used the material non-public

information to execute and cause and assist others to execute the securities transactions listed

below on or about the dates listed below:

| Count | Defendant(s) | Trade Date(s) | Transactions |
|---|---|---|---|
| 3 | JOSEPH LEWIS PATRICK O'CONNOR | February 11, 2019 | Sale of 132,000 shares of Australian Agricultural Company stock by O'CONNOR |
| 4 | JOSEPH LEWIS BRYAN "MARTY" WAUGH | February 11, 2019 | Sale of 110,000 shares of Australian Agricultural Company stock by WAUGH |
| 5 | JOSEPH LEWIS PATRICK O'CONNOR | July 29-30, 2019 | Purchase of 20,900 shares of Solid Biosciences stock by O'CONNOR |
| 6 | JOSEPH LEWIS BRYAN "MARTY" WAUGH | July 26-30, 2019 | Purchase of 16,800 shares of Solid Biosciences stock by WAUGH |
| 7 | JOSEPH LEWIS | July 25, 2019 | Purchase of 150,000 shares of Solid Biosciences stock by the Girlfriend |
| 8 | JOSEPH LEWIS PATRICK O'CONNOR | October 11-16, 2019 | Purchase of 10,675 shares of Mirati Therapeutics stock by O'CONNOR |
| 9 | JOSEPH LEWIS BRYAN "MARTY" WAUGH | October 11-25, 2019 | Purchase of 9,696 shares of Mirati Therapeutics stock by WAUGH |
| 10 | JOSEPH LEWIS | September 19-30, 2019 | Purchase of 16,400 shares of Mirati Therapeutics stock by the Girlfriend |
| 11 | JOSEPH LEWIS | October 9-11, 2019 | Purchase of 108 shares of Mirati Therapeutics stock by LEWIS's senior executive assistant |
| 12 | JOSEPH LEWIS PATRICK O'CONNOR | February 4-10, 2021 | Purchase of 15,497 shares of BCTG Acquisition Corporation stock by O'CONNOR |
| 13 | JOSEPH LEWIS BRYAN "MARTY" WAUGH | February 4-March 1, 2021 | Purchase of 2,060 shares of BCTG Acquisition Corporation stock by WAUGH |
| 14 | JOSEPH LEWIS | April 12, 2021 | Purchase of 1,189 shares of BCTG Acquisition Corporation stock by LEWIS's senior executive assistant |

| 15 | JOSEPH LEWIS | March 19-April 12, 2021 | Purchase of 2,401 shares of BCTG Acquisition Corporation stock by LEWIS's personal assistant |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT SIXTEEN
### (Securities Fraud)

The Grand Jury further charges:

55.     The allegations contained in paragraphs 1 through 42 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

56.     From at least in or about July 2019 up to and including at least in or about August 2019, in the Southern District of New York and elsewhere, JOSEPH LEWIS, PATRICK O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants, knowingly executed, and attempted to execute, a scheme and artifice to (a) defraud a person in connection with a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, the defendants executed a scheme to defraud Solid Biosciences by misappropriating and using material non-public information for the purpose of executing securities transactions in the stock of Solid Biosciences.

(Title 18, United States Code, Sections 1348 and 2.)

23

## COUNT SEVENTEEN
### (Securities Fraud)

The Grand Jury further charges:

57.     The allegations contained in paragraphs 1 through 42 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

58.     From at least in or about August 2019 up to and including at least in or about October 2019, in the Southern District of New York and elsewhere, JOSEPH LEWIS, PATRICK O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants, knowingly executed, and attempted to execute, a scheme and artifice to (a) defraud a person in connection with a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, the defendants executed a scheme to defraud Mirati Therapeutics by misappropriating and using material non-public information for the purpose of executing securities transactions in the stock of Mirati Therapeutics.

(Title 18, United States Code, Sections 1348 and 2.)

## COUNT EIGHTEEN
### (Securities Fraud)

The Grand Jury further charges:

59.     The allegations contained in paragraphs 1 through 42 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

24

60.     From at least in or about February 2021 up to and including at least in or about

April 2021, in the Southern District of New York and elsewhere, JOSEPH LEWIS, PATRICK

O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants, knowingly executed, and

attempted to execute, a scheme and artifice to (a) defraud a person in connection with a security

of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act

of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act

of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises,

money and property in connection with the purchase and sale of a security of an issuer with a class

of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was

required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, the

defendants executed a scheme to defraud BCTG Acquisition Corporation and Tango Therapeutics

by misappropriating and using material non-public information for the purpose of executing

securities transactions in the stock of BCTG Acquisition Corporation.

(Title 18, United States Code, Sections 1348 and 2.)

## COUNT NINETEEN
### (Conspiracy to Commit Securities Fraud and Make False Statements)

The Grand Jury further charges:

61.     The allegations contained in paragraphs 1 through 42 of this Indictment are hereby

repeated, realleged, and incorporated by reference, as if fully set forth herein.

62.     From at least in or about 2013 up to and including at least in or about August 2018,

in the Southern District of New York and elsewhere, JOSEPH LEWIS, the defendant, and others

known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree

together and with each other to commit an offense against the United States, to wit, (i) securities

fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of

25

Federal Regulations, Section 240.10b-5; and (ii) making a false statement in an application, report, or document required to be filed by Chapter 2B of Title 15 of the United States Code, in violation of Title 15, United States Code, Section 78ff.

63.    It was a part and object of the conspiracy that JOSEPH LEWIS, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and courses of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Section 78j(b) and 78ff.

64.    It was further a part and object of the conspiracy that JOSEPH LEWIS, the defendant, and others known and unknown, willfully and knowingly would and did make, and cause to be made, a statement in any application, report, or document required to be filed under Chapter 2B of Title 15 of the United States Code or any rule or regulation thereunder which statement was false or misleading with respect to a material fact, in violation of Title 15, United States Code, Section 78ff.

### Overt Acts

65.    In furtherance of the conspiracy and to effect its illegal objects, JOSEPH LEWIS, the defendant, and others known and unknown, committed and caused to be committed the

26

following overt acts, among others, in the Southern District of New York and elsewhere:

a.      On or about November 4, 2013, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

b.      On or about February 2, 2015, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

c.      On or about September 18, 2015, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

d.      On or about January 6, 2016, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

e.      On or about January 15, 2016, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

f.      On or about March 17, 2016, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

g.      On or about June 8, 2016, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

h.      On or about June 24, 2016, LEWIS falsely stated in a report filed pursuant

to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

        i.        On or about September 28, 2016, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

        j.        On or about January 10, 2017, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

        k.        On or about January 30, 2017, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

        l.        On or about June 27, 2017, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

        m.        On or about November 20, 2017, LEWIS falsely stated in a report filed pursuant to Section 13(d) of the Securities Exchange Act the number of shares he beneficially owned of Mirati Therapeutics.

(Title 18, United States Code, Section 371.)

**FORFEITURE ALLEGATIONS**

      66.      As a result of committing the offenses alleged in Counts One through Nineteen of this Indictment, JOSEPH LEWIS, PATRICK O'CONNOR, and BRYAN "MARTY" WAUGH, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and

28

personal, that constitutes or is derived from proceeds traceable to the commission of said offenses,

including but not limited to a sum of money in United States currency representing the amount of

proceeds traceable to the commission of said offenses.

## Substitute Assets Provision

67.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

       a.     cannot be located upon the exercise of due diligence;

       b.     has been transferred or sold to, or deposited with, a third person;

       c.     has been placed beyond the jurisdiction of the Court;

       d.     has been substantially diminished in value; or

       e.     has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney